UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ARTHUR J. ROUSE, *et al.*,

                    Plaintiffs,              Civil Action No. 20-12308

v.                                           Bernard A. Friedman
                                             United States District Judge

GRETCHEN WHITMER, *et al.*,                  David R. Grand
                                             United States Magistrate Judge

                    Defendants.
_____/

## REPORT AND RECOMMENDATION TO GRANT IN PART AND DENY IN PART DEFENDANTS' MOTION TO DISMISS (ECF No. 94)

This case is a proposed class action involving the temporary denial and alleged disparate treatment of religious group services at the Parnall Correctional Facility ("SMT") during the COVID-19 pandemic. Plaintiffs are 28 prisoners who are, or at one point were, incarcerated at SMT between March 13, 2020 and the present date. Plaintiffs filed an amended complaint, pursuant to 42 U.S.C. § 1983, alleging violations of their constitutional and statutory rights against the following employees of the Michigan Department of Corrections ("MDOC"): Heidi Washington, MDOC Director; Melinda Braman, SMT's former Warden; David Shaver, SMT's current Warden; Kathleen Meyers, SMT's Chaplain; Lee McRoberts, SMT's former Assistant Deputy Warden ("ADW"); J. LaFave, SMT's current ADW; and John and Jane Does 1-5 (collectively, "Defendants").

On January 18, 2022, Defendants filed a Motion to Dismiss. (ECF No. 94). Plaintiffs filed a response on February 15, 2022, and Defendants filed a reply on March 1,

2022.  (ECF Nos. 96, 97).  On April 25, 2022, the Court held oral argument.  With the Court's permission, Plaintiffs subsequently filed a supplemental brief on April 29, 2022, and Defendants filed a supplemental response on May 6, 2022.  (ECF Nos. 100, 101).

## I.    RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that Defendants' Motion to Dismiss **(ECF No. 94)** be **GRANTED IN PART AND DENIED IN PART**.

## II.   REPORT

### A.    Background

Plaintiffs are MDOC prisoners who currently are, or at one point were, confined at SMT in Jackson, Michigan between March 13, 2020 and the present date.  They bring this § 1983 civil rights action, alleging violations of their rights under: (1) the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc, *et seq*. ("RLUIPA"); (2) the Fourteenth Amendment's Equal Protection Clause; and (3) Michigan's Elliot-Larson Civil Rights Act, M.C.L § 37.2101, *et seq.* ("ELCRA").  (ECF No. 92).

In their amended complaint, Plaintiffs allege that they and the proposed class members are SMT prisoners who represent a diverse group of faiths and are currently, or at one point were, incarcerated at SMT between the start of the COVID-19 pandemic in March 2020 and the present date.  (¶49).[1]  Plaintiffs' religious beliefs include several Christian denominations (Catholicism, Protestantism, and Seventh Day Adventists), Islam, Judaism, Buddhism, Wiccans, and Native American Traditional Ways.  (¶50).  According

---

[1] Standalone citations to "¶__" are all to Plaintiffs' amended complaint, found at ECF No. 92.

to Plaintiffs, each of the Defendants were "directly" and "personally" involved in the violation of their rights.  (¶51).  Specifically, former SMT Warden Braman and current SMT Warden Shaver "had ultimate authority on when, and what, programming was resumed, including religious services," but chose "to keep Plaintiffs' primary religious services closed while reopening secular services."  (¶53).  SMT Deputy Warden McRoberts, at times, was delegated "decision-making authority over the opening or closing of secular and religious programming at SMT []."  (*Id.*).  SMT Chaplain Meyers was responsible for "[p]lanning and conducting religious services ... and [m]onitoring and coordinating religious education for residents," and has been "personally involved in decisions made regarding the closures, reopening, and scheduling of religious services at SMT."  (*Id.*) (alterations accepted).  MDOC Director Washington had "ultimate authority over policy decisions such as the restrictions on whether to permit entry of volunteers to MDOC facilities for religious purposes."  (*Id.*).  The complaint addresses two separate time periods during which alleged violations occurred: (a) March 10, 2020, to May 29, 2021 (the "Temporary Closure Period"); and (b) June 1, 2021, to the present date (the "Current Restrictions Period").

a.  <u>Temporary Closure Period: March 10, 2020, to May 29, 2021</u>

Plaintiffs alleges that, on March 10, 2020, Governor Gretchen Whitmer declared a state of emergency after COVID-19 cases were confirmed in Michigan.  (¶54).  Due to the COVID-19 pandemic, defendants Braman, McRoberts, and Meyers shut down all religious services at SMT on March 29th, and at "no point" during the Temporary Closure Period "were Plaintiffs permitted to attend any religious services" at that facility.  (¶¶55, 58).

3

Meanwhile, depending on the "outbreak status," SMT had allegedly "variously opened, closed, and reopened *secular* activities" including "Vocational training," the barber shop, in-person visits, "Core programming," and "School," and inmates "from different units intermixed in the dining hall, kitchen, medication lines, Building 198, property room, yards, and medical facilities." (¶¶56-57, 59-60) (emphasis added).

For example, on June 15, 2020, defendant Braman directed the restarting of "some core programming." (¶62). On July 7th, General Education Development ("GED") classes resumed and "attendance was mandatory." (¶63). In the month of July, the "Employment Readiness Program was operating, involving the mixing of persons from different units within the SMT." (¶64). On July 31st, defendant McRoberts said during a Warden's Forum meeting that there was no date identified for a reopening of the religious services, and that "[a]t present, prisoner constitutional rights for exercise of religious freedoms mirrors conditions in the surrounding communities, who are proceeding with similar caution," even though "there were no state imposed restrictions on religious exercise or congregations" at that time. (¶¶65-66). On September 18th, SMT restarted the "Advanced Substance Abuse Treatment" program as well as "Phase II of the Michigan Sex Offender Program." (¶67).

The complaint further alleges that, by November 13, 2020, a rise in COVID-19 cases throughout the MDOC led to the closure of educational and core programming, but "some core programming" resumed on January 14, 2021. (¶¶68-69). While SMT re-entered "outbreak status" on March 8, 2021, "both weight pits" were reopened on March 12th, it was reported on March 25th that "in-person visitation" would soon resume, some

"core programming" restarted on March 29th, and the barbershop opened on April 2nd. (¶¶70-74). At the start of April 2021, Plaintiff John Moore began attending Phase II MSOP programming, but was still not permitted to attend religious services. (¶75). On May 21st, "it was reported through JPay that core programming had resumed at all facilities other than Charles Egeler Reception and Guidance Center." (¶76). On May 28th, SMT eventually left "outbreak status." (¶77). But regardless of outbreak status, at no point between March 29, 2020, and May 28, 2021, were Plaintiffs permitted to attend religious services. (¶78). Despite Defendants' "clear authority to open or close religious services and secular programming," Plaintiffs were told that "the decision to keep religious services closed was a decision made in Lansing." (¶79). Thus, to the extent "any Jane or John Doe working for the [MDOC] in Lansing was involved in the decision-making process that kept Plaintiff's religious services closed, they are personally responsible for their part in that process." (¶80).

b. Current Restrictions Period: June 1, 2021, to Present Date

Beginning on May 29, 2021, Defendants "deemed it appropriate to permit Plaintiffs to resume some religious services." (¶81). During the Current Restrictions Period, defendant LaFave became SMT's ADW and inherited the responsibilities and authorities of defendant McRoberts, including involvement in decision-making on the opening and closing of SMT's religious services. (¶82). Thus, SMT reopened the Chapel, which is "where most religious services are now being held," and SMT divided the Chapel into "five sections to prevent persons from different units from mixing." (¶83).

Despite the "resumption of some religious services," Plaintiffs "continue to be

denied permission to engage in certain religious services." (¶84).  For example, Plaintiffs of Catholic and Protestant faiths have "a sincere belief that they must attend religious services on Sunday," but "have not been permitted to hold their primary religious service, Sunday services, since March 29, 2020." (¶85).  Plaintiffs of all faiths have been "denied use of the intercom system in the Chapel, making it difficult if not impossible for Plaintiffs to hear the service," which is further "exacerbated by the inclusion of the plastic dividers" used to section off the Chapel.  (¶86).  Plaintiffs of the Muslim faith are prevented from "having persons from different units lead their prayer service because the same unit is always placed at the head of the Chapel which is the only place in the chapel which permits the prayer leader to face West and sit at the front of the service as required by their faith." (¶87).  When plaintiff Moore requested that Chaplain Meyers "permit different units to be placed in the front divider so the Imam could be in the proper location for worship," Moore was told that "this could not happen because of the ongoing litigation." (¶88).

Moreover, Plaintiffs of all faiths "have been denied the ability to have volunteers minister religious services." (¶89).  Volunteers at SMT are important because they "serve numerous religious roles," including "[t]eaching and preaching Plaintiffs' religions," "[a]dministering the Lord's Supper for Catholic and Protestant Plaintiffs," and "[a]dministering communion for members of the Christian religions." (¶90).  Plaintiffs and "the putative class members" are also "not permitted to have secondary religious services without the presence of a volunteer," so "persons who have scheduling conflicts on the day religious services are currently being provided are barred from attending their services." (¶¶91-92).  Plaintiffs allege that SMT has also "drastically cut" the time allotted

for religious services, such as Jewish religious services which were reduced from 90 minutes to 45 minutes, which "prevent[s] them from completing their Torah reading and prayers." (¶93).

Plaintiffs further allege that, as of May 29, 2021, all secular "core programming" activities have been resumed and continued since that date without interruption," and emphasize that "non-employee persons" have been able to enter SMT for "secular purposes," including "refil[l]ing vending machines, in-person visits, and educational programming." (¶¶94-95). Meanwhile, due to the prohibition against volunteers for religious services, Catholic Plaintiffs still have "not had confession," Catholic and Protestant Plaintiffs have "not had a Lord's Supper," and no members of the Christian faith have had communion. (¶¶96-98). Moreover, members of the Jewish faith are "no longer capable of facing the Torah and Tabernacle while facing East, as their faith requires, because the Christian religious items occupy the Eastern side of the Chapel" and "no one other than a Rabbi is permitted to move the Torah or Tabernacle." (¶100). Members of the Buddhist religion are also "now required to attend their religious services in the Chapel and prevented from bringing their rugs used in meditation" on the ground. (¶101). Finally, without use of the Chapel's intercom, Plaintiffs have difficulty hearing the person ministering the religious services. (¶99).

Based on the above allegations, Plaintiffs raise claims under the Fourteenth Amendment Equal Protection Clause, ELCRA, and RLUIPA. As for their Equal Protection claims, Plaintiffs allege that, during the Temporary Closure Period, Defendants treated them "differently than secular persons at the same facility" during the Temporary Closure

7

Period, where Defendants had "control and authority over the activities at SMT" but "suspended Plaintiffs' religious services while permitting secular activities to continue," and that "operating secular programming while prohibiting religious services in the same facility is a clear violation of Plaintiff's equal protection rights." (¶¶119-27). During the Current Restrictions Period, Plaintiffs allege Defendants Shaver, LaFave, and Meyers, who "all have authority over the operation of religious services" at SMT, "continue[d] to deny Plaintiffs access to volunteers needed to minister secondary religious services," which "effectively denies people with scheduling conflicts access to religious services," prohibited religious volunteers necessary for "certain religious exercises," and "halve[d] the time allotted for religious services while secular programming maintains the same pre-pandemic scheduling." (¶¶130-33).[2]

As for their RLUIPA claim, Plaintiffs allege that each of the named Defendants "is

---

[2] As for their ELCRA claim, which, as discussed below, is analyzed under the same framework applicable to their Equal Protection claim, Plaintiffs allege that while "SMT is a place of public accommodation," during the Temporary Closure Period, defendants Braman, Shaver, and McRoberts made and/or enforced decisions denying Plaintiffs' "full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations" based "solely on their religion." (¶¶139, 141-42). During the Current Restrictions Period, Plaintiffs allege that Defendants "violated and continue to violate" their rights under the ELCRA because "Shaver and LaFave have the sole authority to permit or deny volunteers access to [SMT] for religious services despite the access granted to other non-MDOC personnel for secular purposes." (¶153). Defendants Meyers also "oversees planning and facilitating religious services" at SMT, has "determined that Sunday worship is not necessary for Plaintiffs," and has "also refused to permit members of the Muslim faith from alternating which cohort is in the front of the Chapel, preventing them from placing their Imam in front as required by their religion." (¶¶154-55). Meyers, Shaver, and LaFave have "determined that all religious services, other than Native American Traditional Ways, must take place inside the Chapel without any opportunity for those services to take place in their pre-pandemic locations," which "deny Plaintiffs equal access to the services at [SMT] solely on account of their religion and therefore violate Plaintiffs' rights" under the ELCRA. (¶¶156-57).

aware of the restrictions placed on Plaintiffs' religious exercise, has the authority to stop it, and has refused to take any action to eliminate the substantial burdens on Plaintiffs' religious exercise." (¶161). Specifically, Plaintiffs contend that: (a) prohibiting Sunday services "imposes a substantial burden on Catholic and Protestant Plaintiffs religious exercise by denying them worship on their primary day of worship" (¶163); (b) preventing the use of the Chapel intercom imposes a substantial burden because it prevents "all persons within the Chapel from hearing the religious services, thereby effectively denying them access to religious services" (¶164); (c) preventing religious groups from conducting services in the locations they previously used before the pandemic imposes a substantial burden on religious exercises "that require Plaintiffs face a certain direction with a person, religious symbols, or religious texts in that same direction" (¶165); and (d) preventing volunteers from entering SMT and ministering religious services prevents "Catholics Plaintiffs from receiving confession," "Catholic and Protestant Plaintiffs from receiving the Lord's Supper," "Plaintiffs from all religions [from interacting with] [] religious preachers and/or teachers," and "Plaintiffs from all religions from having secondary services." (¶166).

Plaintiffs further allege that defendants Washington, Shaver, LaFave, and Meyers "have less restrictive means to prevent the spread of COVID-19," including "[p]ermitting religious services when [SMT] is not on outbreak status in the same manner core programming was opened," "[p]roviding cleaning supplies for the Chapel intercom in the same way that Defendants have allegedly provided cleaning supplies for the phones and other common areas at SMT," "[p]ermitting vaccinated and masked persons to use the

intercom," and "[p]ermitting volunteers to enter SMT and minister religious services with mandatory vaccination, testing, and mask requirements." (¶167).

As a result, Plaintiffs seek damages against Defendants in their individual capacities on their Equal Protection and ELCRA claims, as well as injunctive relief against Defendants Washington, Shaver, Meyers and LaFave in their official capacities to restrain them "from violating RLUIPA in the ways identified in this complaint," reasonable costs and attorneys fees, and any other relief deemed just and proper. (¶¶37-43, 168).

Attached to Plaintiffs' complaint are several salient MDOC documents, including two of Director Washington's Office Memoranda dated May 27, 2020, and June 23, 2021 (ECF No. 92, PageID.867-94); MDOC's Policy Directive for "Religious Beliefs and Practices of Prisoners" (*id.*, PageID.896-908); certain MDOC employee job descriptions (*id.*, PageID.910-17); a declaration from Chaplain Meyers dated August 18, 2021 (*id.*, PageID.919-32); and a SMT Warden's Forum report dated July 30, 2020 (*id.*, PageID.934-36).

In relevant part, Chaplain Meyers attests to the following in her declaration. (ECF No. 92, PageID.919-26). In her position as SMT's Chaplain, Meyers coordinates the scheduling of, and provides support for holding religious services in the chapel for various religious denominations. (*Id.*, PageID.920). During the COVID-19 pandemic, the Chapel was closed for a period in accordance with MDOC COVID-19 response measures designed to promote social distancing and to help mitigate the spread of the virus among prisoners wishing to attend in-person religious services. (*Id.*). In-person religious services in the Chapel resumed on May 29, 2021, after SMT was removed from "outbreak status," and

10

are currently being held in the Chapel according to the SMT Religious Programs Restart Proposed Schedule.  (*Id.*).

Meyers attests that Christian Protestant services are held on Wednesday and Thursday evenings, and Catholic services are held on Thursday afternoons.   (*Id.*, PageID.921).  Because SMT is a Level I facility, MDOC policy provides that group religious services and activities require at least "random in-room staff supervision" and "certain activities (such as use of candles or other incendiary devices) require constant in-room supervision."  (*Id.*).  As to Christian Protestant and Catholic services not being offered on Sundays, SMT continues to offer religious services Tuesday through Saturday, consistent with the pre-COVID-19 pandemic schedule for religious services.   (*Id.*). Starting May 30, 2021, Meyers' work schedule shifted from Monday through Friday to Tuesday through Saturday so that it would align with the Chapel schedule and so that she could provide as much supervision for the Chapel as possible and assure compliance with COVID-19 mitigation strategies, including use of housing unit cohort zones, mask usage, and social distancing.  (*Id.*, PageID.921-22).

According to Meyers, SMT viewed Islamic, Jehovah's Witnesses, and Jewish group scheduling flexibility "as very limited, as some of these religions do not deviate from specific days of worship in the surrounding community (i.e. Fridays and Saturdays only for Islamic and Jewish services, respectively)," whereas "Catholic and Protestant groups have traditionally shown greater flexibility in this regard, as reflected in the surrounding community (offering weeknight services)."  (*Id.*, PageID.922).  Accordingly, the current Chapel schedule "makes a reasonable attempt to balance these various considerations to

11

the extent practicable using a Tuesday through Saturday schedule."  (*Id.*).

Meyers further attests that, while SMT "is not currently allowing volunteers to enter the facility," she is "advised that it would be very difficult to secure religious volunteers of the Christian Protestant and Catholic faiths for Sunday services, due to other pressing demands on their schedules, and that once permitted to volunteer on-site (assuming current COVID-19 restrictions are further relaxed), they would prefer to volunteer at SMT during the week."  (*Id.*, PageID.922-23).  "Hopefully, religious volunteers will be allowed on-site soon, once COVID-19 restrictions are further relaxed, but currently, SMT has not been authorized to allow on-site religious volunteers under current restrictions."  (*Id.*, PageID.923).

Meyers continues to attest that six-feet-tall plastic dividers are used in the Chapel to help mitigate the spread of COVID-19 through social distancing and "cohorting" prisoners to and from the Chapel "according to their respective housing units."  (*Id.*, PageID.923-24).  These dividers serve an "important function in terms of mitigating the spread of viruses, by cohorting prisoners inside the chapel in designated areas according to their respective housing units, which also makes it easier to clean and sanitize the chapel after each use."  (*Id.*).  They also allow for separate entrances and exits leading into the different sections of the chapel, which further helps "mitigate contact between prisoners of different housing units."  (*Id.*).

As for the "temporary discontinuation of the intercom system inside the chapel," Meyers attests that the "mixing board component of the intercom" is located "towards the front of the chapel in an area sectioned off by the plastic dividers."  (*Id.*, PageID.925).

Thus, "[u]nder current restrictions, there is no practical way to move this mixing board inside the chapel to accommodate the use of the intercom system by prisoners of different housing units," and there are also "sanitation and hygiene issues associated with allowing prisoners to handle the various components of the intercom system ... including the microphones, electrical cables and mixing board." (*Id.*). Meyers "believe[s] the sanitation issues associated with keeping these components clean after every use to minimize the spread of viruses, outweigh the inconvenience of temporarily discontinuing the use of the intercom system," and based on her "daily experience working inside the chapel," she "do[es] not believe it is difficult for prisoners to hear each other during religious services without the intercom system." (*Id.*, PageID.925-26).

Defendants now move for dismissal of the Plaintiffs' complaint for failure to state a claim and based on qualified immunity. (ECF No. 94). For the reasons discussed below, the Court finds that Plaintiffs have plausibly alleged a RLUIPA claim, but that their claims under the Equal Protection Clause and ELCRA are subject to dismissal.

### B.     Standard of Review

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests a complaint's legal sufficiency. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plausibility standard

"does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Twombly*, 550 U.S. at 556.  Put another way, the complaint's allegations "must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief."  *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (emphasis in original) (citing *Twombly*, 550 U.S. at 555-56).

In deciding whether a plaintiff has set forth a "plausible" claim, the Court must accept the factual allegations in the complaint as true.  *Id.*; *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  That tenant, however, "is inapplicable to legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to prevent a complaint from being dismissed on grounds that it fails to comport sufficiently with basic pleading requirements.  *Iqbal*, 556 U.S. at 678; *see also Twombly*, 550 U.S. at 555; *Howard v. City of Girard Ohio*, 346 F. App'x 49, 51 (6th Cir. 2009).  Ultimately, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679.

C.    **Analysis**

As detailed above, Plaintiffs raise claims under RLUIPA, the Equal Protection Clause, and ELCRA.  The Court will first address the RLUIPA claim, followed by the Equal Protection and ELCRA claims.

i.  RLUIPA Claim

In their motion to dismiss, Defendants argue that Plaintiffs fail to state a RLUIPA

14

claim because "the burden imposed on prisoners' abilities to practice their religions is not substantial," and even if so, "the MDOC has a compelling interest—reduction of the spread of COVID-19—that justifies the temporary suspension of and restrictions on religious group services." (ECF No. 94, PageID.971-73). RLUIPA provides "expansive protection" for prisoners' religious liberty. *Holt v. Hobbs*, 574 U.S. 352, 358 (2015). Analysis under that statute is a "three-act play." *Cavin v. Mich. Dep't of Corr.*, 927 F.3d 455, 458 (6th Cir. 2019). First, the inmate must demonstrate that he seeks to exercise religion out of a "sincerely held religious belief," and second, the inmate must show that the government "substantially burdened that religious exercise." *Id.* If the inmate satisfies the first two steps, the burden then shifts to the government to show that (1) the imposition of the substantial burden on an inmate's religious exercise was "in furtherance of a compelling governmental interest," and (2) it used "the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a)(1)-(2); *Fox v. Washington*, 949 F.3d 270, 282 (6th Cir. 2020).

As an initial matter, Plaintiffs represented during oral argument that their RLUIPA claim seeking injunctive relief only pertains to the Current Restrictions Period (but not the Temporary Closure Period). Thus, the Court will only focus on the allegations pertaining to the Current Restrictions Period in analyzing their RLUIPA claim.

### a. *Plaintiffs Plausibly Allege a Substantial Burden to Their Sincerely Held Religious Beliefs*

Defendants first broadly argue that "the temporary closure and/or restrictions to religious services put in place by the MDOC to reduce the spread of COVID-19 do not rise

to the level of a substantial burden" because "RLUIPA does not contemplate that every burden imposed by the government amounts to a 'substantial' one." (ECF No. 94, PageID.973).[3] But in determining whether a restriction constitutes a "substantial burden," the Sixth Circuit has stated that prison officials who place "substantial pressure on an adherent to modify his behavior and to violate his beliefs, [] or 'effectively bar' his sincere faith-based conduct ... [] necessarily place a substantial burden on it." *Haight v. Thompson*, 763 F.3d 554, 565 (6th Cir. 2014) (citing *Hayes v. Tenn.*, 424 F. App'x 546, 555 (6th Cir. 2011), and *Living Water Church of God v. Charter Twp. of Meridian*, 285 F. App'x 729, 739 (6th Cir. 2007)).  Moreover, "[s]o long as the practice is traceable to a sincerely held religious belief, [] it does not matter whether the inmate's preferred exercise is 'central' to his faith." *Id.* at 559-60 (citing *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005), and 42 U.S.C. § 2000cc-5(7)(A)).

Plaintiffs respond that "it appears as though [Defendants'] only argument that the restrictions are not substantial is that the existence of the COVID-19 pandemic renders what would normally be a substantial burden insubstantial." (ECF No. 96, PageID.1000). The Court agrees with Plaintiffs on this point.  A review of the amended complaint reflects allegations of several substantial burdens on Plaintiffs' sincerely held religious beliefs: (1) Catholic and Protestant Plaintiffs have not been permitted to hold their religious services on their primary day of worship of Sunday (¶85); (2) Plaintiffs of all faiths have a

---

[3] Defendants do not challenge the sincerity of Plaintiffs' religious beliefs, *see McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) (waiver), and confirmed as much during oral argument.

"difficult if not impossible" time of actually hearing the religious services due to the denial of access to the Chapel's intercom (¶86); (3) Plaintiffs of all faiths have been denied the ability to have religious volunteers, which prevents teaching and preaching of religions, the administration of confessions for Catholics, the Lord's Supper for Catholics and Protestants, and communion for Christians, and secondary religious services for persons who have scheduling conflicts on the day religious services are currently being provided (¶¶89-92); and (4) Plaintiffs are prevented from worshipping in their traditional areas which prevents them from facing the religiously-required direction during the service (¶¶87-88; *see also*, *e.g.*, ¶100 ("members of the Jewish faith are no longer capable of facing the Torah and Tabernacle while facing East, as their faith requires")).

Significantly, Defendants do not dispute that SMT's restrictions on religious services effectively bar Plaintiffs from any of the above forms of faith-based conduct. Instead, Defendants argue in reply that the above restrictions are "*de minimis* [burdens] and do not prevent prisoners from exercising their religions, or do not involve religious exercise at all." (ECF No. 97, PageID.1027). The problem with their argument is that "[t]he substantial-burden question turns on the impact of a government regulation on the individual *inmate*, not the centrality of those beliefs to canonical texts as interpreted by judges or prison officials." *Haight*, 763 F.3d at 555 (emphasis in original). Indeed, Defendants' actual argument appears to be that Plaintiffs can adequately exercise their religion, *despite* their inability to perform specific religious practices that they deem essential, but, again, "RLUIPA protects a broad spectrum of sincerely held religious beliefs, including practices that non-adherents may consider unorthodox, unreasonable or

17

not 'central to' a recognized belief system." *Id.* at 566 ("RLUIPA thus does not permit a prison warden to deny a Catholic inmate access to wine for a communion service on the ground that grape juice is a reasonable substitute or to deny grape juice to a Presbyterian inmate on the ground that water is a reasonable substitute.").

Defendants' arguments to the contrary are unpersuasive.  First, their contention that "[t]he burden is not substantial when prisoners cannot conduct group services on a specific day" in inconsistent with their own reliance on Chaplain Meyers' declaration, which specifically recognizes the significance of "specific days of worship," *i.e.*, that SMT identified Islamic, Jehovah's Witnesses, and Jewish groups as requiring services on "Fridays and Saturdays only" because these religions "do not deviate from specific days of worship."  (ECF No. 92, PageID.922).  The mere fact that Defendants determined on their own that Catholic and Protestant groups have "traditionally shown greater flexibility in this regard" does not render insubstantial the burden to *these* Catholic and Protestant Plaintiffs' "sincere belief that they must attend religious services on Sunday."  (¶85).[4]

Second, Defendants assert there is no substantial burden "where civilian volunteers cannot lead group services ... merely because prisoners do not have access to the worship leader of their choice."  (ECF No. 97, PageID.1027).  But this mischaracterizes the main point of Plaintiffs' allegations, which is that the prohibition against volunteers prevents prisoners from engaging in certain practices essential to their faith, including, for example,

---

[4] Defendants' citation to *Goddard v. Alexakos*, 2018 WL 1168611 (E.D. Ky. Mar. 6, 2018), does not change the analysis because that case did not address the issue of whether it was a substantial burden for a prisoner to be prohibited from practicing on his primary day of worship.

confessions for Catholics, the Lord's Supper for Protestants, the moving of the Torah and Tabernacle to face the proper direction for Jews, or even attending religious services at all for prisoners with conflicting schedules for mandatory secular programming.  (¶132); *Haight*, 763 F.3d at 565.

Finally, Defendants' position that "access to the intercom does not involve either [] religious exercise or [] sincerely held beliefs" (ECF No. 97, PageID.1028), misses the mark, as it fails to recognize Plaintiffs' point that the lack of access to the Chapel's intercom prevents inmates from actually *hearing* the religious services, and thereby effectively denies them access to religious services.  (¶164).  To suggest that the restriction on using the *Chapel's intercom* that prevents prisoners from adequately hearing the religious services cannot constitute a substantial burden – based on the mere fact that the use of an intercom itself is not a "religious exercise" – simply lacks merit.[5]

Accordingly, for the reasons detailed above, Plaintiffs sufficiently alleged that the challenged restrictions substantially burdened their sincerely held religious beliefs, and the burden now shifts to Defendants to show that such restrictions were the least restrictive means of furthering a compelling government interest.

> b. *Defendants Fail to Meet Their Burden to Show They Used the Least Restrictive Means of Furthering a Compelling Government Interest*

In their motion, Defendants argue that any "burden is in furtherance of a compelling

---

[5] The Court notes Meyers' contention that based on her "daily experience working inside the chapel," she "do[es] not believe it is difficult for prisoners to hear each other during religious services without the intercom system."  (*Id.*, PageID.925-26).  However, at the motion to dismiss stage the Court must credit the Plaintiffs' factual allegations, and they allege the opposite is true. (¶99).

governmental interest through the least restrictive means" because it is "undisputed that the purpose of the restrictions on group religious services is to reduce the spread of COVID-19 in prison during a global pandemic." (ECF No. 94, PageID.973). Put simply, Defendants' argument is logically flawed because it improperly assumes that *any* restriction addressing a compelling interest is the "*least restrictive means*" of doing so. While preventing the spread of COVID-19 at SMT is certainly a compelling state interest, *see Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) ("Stemming the spread of COVID-19 is unquestionably a compelling [state] interest"), Defendants fail, at least at the dismissal stage, to meet their heavy burden of showing that the challenged restrictions are the "least restrictive means" of advancing that compelling interest. *Holt*, 574 U.S. at 364-65, 369. In this regard, the law is clear that the government's burden is an "exceptionally demanding" standard, and if any "less restrictive means is available for the Government to achieve its goals, then the Government must use it." *Holt*, 574 U.S. at 364-65. Indeed, "[c]ourts must hold prisons to their statutory burden, and they must not assume a plausible, less restrictive alternative would be ineffective." *Id.* at 369 (quotation omitted). Defendants' arguments on this issue all lack merit.

Defendants' untested contention that "because there is no lesser restrictive alternative to closing and/or restricting group services that is guaranteed to prevent the spread of the virus, Plaintiffs fail to state a viable claim," is misguided. (ECF No. 94, PageID.972). Under RLUIPA, the salient task is not identifying which measure most effectively guarantees preventing the spread of COVID-19, but rather, which measure of preventing the spread of COVID-19 can be implemented that also least restricts Plaintiffs'

religious liberty. *Holt*, 574 U.S. at 364-65 ("[I]f a less restrictive means is available for the Government to achieve its goals, then the Government must use it."). In other words, even if the current restrictions are the *most effective* means of stemming the spread of the virus, Defendants must show that they are also the *least restrictive* means of achieving its goals. As laid out below, Defendants primarily argue that SMT's restrictions on religious services accomplish their "reasonable penological objectives," but they fail to meet their "exceptionally demanding burden" to show that there are no lesser restrictive alternatives.

To start, Defendants' argument that they "have burdened the Plaintiffs' right in the least restrictive way" because the "limitations described in Chaplain Meyers' Declaration ... provides a ***rational justification*** for the various restrictions imposed" reflects the fatal flaw of their position noted above. (ECF No. 94, PageID.975) (emphasis added). Again, the RLUIPA standard is not whether Defendants' restrictions are ***rationally justified***, but whether Defendants have shown that they used "***the least restrictive means*** of furthering [their] compelling governmental interest." *Fox*, 949 F.3d at 282 (emphasis added); *see also Holt*, 574 U.S. at 364-65 ("The least-restrictive-means standard ... requires the government to sho[w] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion [].") (quotations omitted). Rather than applying the salient standard, Defendants double down on the *reasonableness* of their restrictions by continuing to argue that "Chaplain Meyers explains how she is attempting to strike a ***reasonable balance*** between allowing religious group gatherings to resume while furthering MDOC's [] compelling government interest" and how such "***reasonable balancing measures*** extend to each of the Plaintiffs' complaints." (ECF No. 94,

PageID.975-76 (emphasis added); *see also id*., PageID.968 ("The chapel schedule makes a *reasonable attempt* to balance these various considerations...") (emphasis added)). But "reasonableness" is not the RLUIPA standard, and Defendants otherwise fail to sufficiently show how any of their "reasonable" measures were the *least restrictive* ones, much less that they lacked any other less restrictive means of achieving their desired goal.

Defendants' other arguments to the contrary lack merit. First, Defendants contend that Plaintiffs' focus on how "SMT is administering its secular programs (i.e., educational programming), or how it is performing essential services during the pandemic (i.e., food service)," is a "red herring" because "in the prison context, there are myriad different scenarios and circumstances this Court would have to analyze to form any reliable impressions regarding how the subject restrictions compare to COVID-19 restrictions in other areas of prison life." (ECF No. 94, PageID.976). The Court has no quarrels with Defendants' general position that, as a practical matter, implementing COVID-19 safeguards likely requires a certain level of individual tailoring to the unique "scenarios and circumstances" presented by each of religious services and/or other secular programs. But for the sole purpose of analyzing the instant RLUIPA claim, Defendants' argument improperly shifts the burden onto the Plaintiffs to show that SMT's religious services cannot accommodate any lesser restrictive alternatives, such as those lesser restrictions that are allegedly being implemented on secular programs.[6] In other words, RLUIPA places

---

[6] Plaintiffs have also alleged several "less restrictive means to prevent the spread of COVID-19," including "[p]ermitting religious services when [SMT] is not on outbreak status in the same manner core programming was opened," "[p]roviding cleaning supplies for the Chapel intercom in the same way Defendants have allegedly provided cleaning supplies for the phones and other

the burden on *Defendants* to show that SMT's restrictions on secular programs are different, and how or why the level of restrictions for secular programs cannot be similarly accommodated for religious services.  At least on the present record, Defendants have not met that heavy burden.

For example, Defendants have not demonstrated why "non-employee persons have been able to enter SMT for secular purposes, including refilling vending machines, in-person visits, and educational programming" since May 29, 2021, but non-employee volunteers entering SMT for religious purposes have been banned during the Current Restrictions Period.  (¶95).  While Chaplain Meyers "advised" it would be "very difficult" to secure religious volunteers for Sunday services, she has not attested that she made legitimate efforts at recruiting, but was unable to secure, any volunteers willing to come in on Sunday.  (ECF No. 92, PageID.922-23).  Likewise, while Meyers "believes" sanitation issues "outweigh the inconvenience" of temporarily discontinuing the use of the intercom system, Defendants have not shown that they lack some lesser restrictive means of allowing limited use of the intercom in a sanitary manner.  (*Id.*, PageID.925-26).[7]  At bottom, Defendants cannot simply presume that, when implementing any lesser restrictive safety measures and/or the same restrictions as secular programs, religious services alone will

---

common areas at SMT," "[p]ermitting vaccinated and masked persons to use the intercom," and "[p]ermitting volunteers to enter SMT and minister religious services with mandatory vaccination, testing, and mask requirements." (¶167).

[7] As further examples, Defendants have not shown why a non-employee Rabbi volunteer cannot enter the Chapel during times and/or days when there are no religious services to move the Torah or Tabernacle before the Jewish services, or why a vaccinated, negative-testing Protestant volunteer cannot enter the Chapel to administer communion or prepare the communion prior to service before any inmates enter the Chapel for service.

cause a spread of the virus or that only harsher restrictions can prevent its spread.[8]

In short, the Court cannot assume Defendants' "reasonable" balancing measures were also the least restrictive means of achieving its laudable goals; rather, the Court "must hold prisons to their statutory burden, and [the Court] must not assume a plausible, less restrictive alternative would be ineffective." *Holt*, 574 U.S. at 369 ("[T]he courts below deferred to these prison officials' mere say-so that they could not accommodate petitioner's request. RLUIPA, however, demands much more.").

For the reasons detailed above, Defendants have not carried their burden to demonstrate that applying lesser restrictions and/or the same restrictions currently in place for secular programs to religious services would be ineffective in stemming the spread of COVID-19 at SMT. Thus, Plaintiffs raise a plausible RLUIPA claim for injunctive relief against Defendants in their official capacities for the Current Restrictions Period. The Court should therefore deny Defendants' motion to dismiss Plaintiffs' RLUIPA claim.

## ii. Fourteenth Amendment Equal Protection and ELCRA claims

Defendants next argue for dismissal of Plaintiffs' Fourteenth Amendment Equal Protection and ELCRA claims because "in temporarily closing and/or restricting religious

---

[8] Defendants also argue that, "to the extent Plaintiffs allege other non-essential programs have been opened, they do not allege those programs allow prisoners to inter-mingle with prisoners of other housing units that they would not otherwise have access to in their own quarantined units, which is precisely the situation with in-person group religious services under normal circumstances." (ECF No. 94, PageID.976-77). But at the dismissal stage, the Court must accept as true the complaint's specific factual allegation that "inmates from different units intermixed in the dining hall, kitchen, medication lines, Building 198, property room, yards, and medical facilities," and that "[d]uring July 2020, the Employment Readiness Program was operating, involving the mixing of persons from different units within the SMT." (¶¶57, 64); *Iqbal*, 556 U.S. at 678.

group gatherings during the pandemic," they did not "discriminate against any religious belief," and imposed restrictions that were otherwise "equally applied across all religions" in furtherance of a "compelling governmental interest." (ECF No. 94, PageID.980-81).[9]

The Fourteenth Amendment's Equal Protection Clause "protects against invidious discrimination among similarly-situated individuals or implicating fundamental rights." *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006) ("The Clause embodies the principle that all persons similarly situated should be treated alike."). "To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis." *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (quotations omitted). The Sixth Circuit has stated that "[t]he threshold element of an equal protection claim is disparate treatment; once disparate treatment is shown, the equal protection analysis is determined by the classification used by the government decision-makers." *Scarbrough*, 470 F.3d at 260. "Of course, to establish an equal

---

[9] Plaintiffs agree with Defendants that "it is proper to consider Plaintiffs' Equal Protection Clause and ELCRA claims together" because "[p]rotections of ELCRA were intended to be coextensive with the Equal Protection and Antidiscrimination Clauses of the Michigan Constitution," and "Michigan courts have found that [t]he scope of Michigan's Equal Protection Clause is coextensive with that of its federal counterpart, so the provisions will be considered together in analyzing defendant's claim." (ECF No. 96, PageID.1008) (quotations omitted); *see People v. James*, 326 Mich. App. 98, 105 (Mich. Ct. App. 2018). *See also Lucas v. Monroe Cnty.*, 203 F.3d 964, 972 n.4 (6th Cir. 2000) (stating that, because Plaintiffs' rights under the Michigan Constitution essentially track those guaranteed by the United States Constitution, the same analyses applied to their federal constitutional claims also apply to their counterpart Michigan Constitution claims); *Woodland v. Michigan Citizens Lobby*, 423 Mich. 188, 378 N.W.337, 343 (1985) (stating that the freedom of religious belief provision in Mich. Const. art. 1, § 4, is subject to similar interpretation as the establishment and free exercise clauses of the First Amendment).

protection violation, a plaintiff must establish more than differential treatment alone—a discriminatory intent or purpose is required." *Maye v. Klee*, 915 F.3d 1076, 1085 (6th Cir. 2019).

Here, Plaintiffs' Equal Protection claim is somewhat confusing. To the extent Plaintiffs argue they "were similarly situated to other incarcerated persons at SMT" but "were subjected to discriminatory application of COVID-19 restrictions because of their religions" (ECF No. 96, PageID.1014) (emphasis added), the problem for Plaintiffs is that their own allegations and arguments make clear that both religious and non-religious prisoners were equally subject to the same restrictions at SMT. For instance, Plaintiffs themselves argue that "[a]ll persons incarcerated at SMT were subjected to the same general restrictions on their liberty imposed by incarceration," and "[a]ll the persons at SMT were permitted to attend secular programming ... while no incarcerated persons were able to attend religious services." (*Id.*, PageID.1013-14). In other words, both religious and non-religious prisoners were equally permitted and/or required to attend secular activities and were equally restricted in their use of the Chapel for activities, religious or otherwise. The same is true for Plaintiffs' arguments about use of the Chapel's intercom (*i.e.*, both religious and non-religious prisoners were equally prohibited from its use), and non-employee visitors entering SMT (*i.e.*, both religious and non-religious prisoners were equally allowed "two-hour in-person visitations," equally allowed to use the vending machines refilled by "contractors," equally permitted or required to attend "secular education," and equally prohibited from seeing a religious volunteer in person). (*Id.*, PageID.1014). In short, Plaintiffs' complaint wholly fails to allege that religious prisoners

have been treated differently in any manner from other non-religious SMT prisoners.

To the extent Plaintiffs assert that Defendants violated their "equal protection" rights because "Defendants made conscious decisions to treat *religious activities* less favorably than similarly situated *secular activities*" and that "this Court's analysis should focus on [] the differential application of those restrictions between similarly situated secular and non-secular activities" (ECF No. 96, PageID.1007) (emphasis added), this argument still fails to show how *Plaintiffs* are treated any differently than non-religious prisoners.[10]   Nor does Plaintiffs' contention in their supplemental brief that "[t]he Equal Protection Clause permits comparing *different groups* so long as they are similarly situated in all relevant aspects," (ECF No. 100, PageID.1040) (emphasis added), change the analysis where Plaintiffs, again, fail to show how SMT treated the "group" of religious

---

[10] To the extent "secular versus religious" activities are valid comparators for purposes of an Equal Protection claim, Plaintiffs fail to satisfy the threshold showing that the "religious activities" in question are similarly situated in any respect to the "secular activities" they identify, much less that they are similarly situated in all relevant respects.  Indeed, the complaint is devoid of any specific details regarding the logistics of SMT's secular programs, such as the size and layout of the location hosting the secular programs, the nature of the secular activities, the number of prisoners attending secular programs at one time, or the COVID-19 safeguards and restrictions implemented for those secular programs.  As an example, while Plaintiffs allege that as of May 29, 2021, "non-employee persons have been able to enter SMT for secular purposes, including refilling vending machines, in-person visits, and educational programming" (¶95), they allege no facts from which this Court can infer that such "non-employee persons" perform any functions similar to those performed by religious volunteers.  In other words, a non-employee person refilling vending machines who may have no contact with (or even see) a prisoner while restocking the machine, would be entirely different from a religious volunteer who may have to administer the Lord's Supper in the Chapel together with the prisoners during their religious service, break the bread, prepare the wine, and distribute it to the prisoners.  Plaintiffs fail to provide any such details.

prisoners any differently from the "group" of non-religious prisoners.[11]

Rather, Plaintiffs' argument that their rights to religious exercise are being burdened by the different restrictions imposed on religious and secular activities appears to actually be a free-exercise challenge repackaged into an equal-protection claim. *See St. John's United Church of Christ v. City of Chicago,* 502 F.3d 616, 638 (7th Cir. 2007) ("St. John's first tries to repackage its free exercise argument in equal protection language, by claiming that the new § 30 unduly burdens its fundamental right freely to exercise its religion."). Indeed, the Court's independent review of relevant caselaw reflects that a plaintiff's challenges to COVID-19 regulations treating religious services more harshly than comparable secular activities are properly considered First Amendment Free Exercise claims – and Plaintiffs fail to cite a single case raising such a claim under the Equal Protection Clause. *See, e.g.*, *Roman Catholic Diocese of Brooklyn*, 141 S. Ct. at 66 (First Amendment Free Exercise challenge to governor's COVID-19 regulations that "treat[ed] houses of worship more harshly than comparable secular facilities"); *Tandom v. Newsom*, 141 S. Ct. 1294, 1296-97 (2021) (First Amendment Free Exercise challenge to government's COVID-19 regulations treating "some comparable secular activities more

---

[11] Plaintiffs cite to *Satawa v. Macomb Rd. Comm'n*, 689 F.3d 506, 528-29 (6th Cir. 2012), as the "most relevant decision for this inquiry" (ECF No. 100, PageID.1040), but putting their eggs in that basket shows just how doomed Plaintiffs' Equal Protection claim is. *Satawa* is of no relevance here because that case addressed an equal protection claim based on free speech in a traditional public forum in free society, and thus applied "strict scrutiny," *Satawa*, 689 F.3d at 524, whereas the restrictions at issue here impact inmates' practice of their religions within the prison setting, where, for the reasons explained below, *see infra* at 28-36, the significantly less-exacting "rational basis scrutiny" applies. Relatedly, in *Satawa*, the court found the plaintiff had a viable First Amendment claim, but here, as explained below, *id.*, because the incarcerated Plaintiffs' claim would fail under the First Amendment, so too does their Equal Protection claim.

favorably than at-home religious exercise"); *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (First Amendment Free Exercise challenge to governor's executive order placing different restrictions on "places of worship" versus "comparable secular gatherings" in an effort to limit the spread of COVID-19); *Roberts v. Neace*, 958 F.3d 409, 413 (6th Cir. 2020) (First Amendment Free Exercise challenge to a governor's order prohibiting faith-based mass gatherings during COVID-19 pandemic but allowing exceptions for comparable secular activities); *Hawse v. Page*, 7 F.4th 685, 687, 687-88 (8th Cir. 2021) (First Amendment Free Exercise challenge to county director's COVID-19 order distinguishing between "churches, which were subject to gathering size limitation, and various secular business that were not").  Albeit (and significantly) in the prison context, Plaintiffs here raise the same claim – that religious services at SMT are treated more harshly than other secular programs.[12]

In any case, even considering Plaintiffs' claim as being framed under Equal Protection language alleging discrimination implicating the "fundamental right" to free exercise of religion, dismissal is appropriate.  The parties suggest that an Equal Protection claim implicating fundamental rights should be analyzed under strict scrutiny.  (ECF No.

---

[12] Notably, the plaintiffs in *Tandom*, *Roman Catholic Diocese of Brooklyn*, and *Roberts* prevailed on their requests for emergency injunctive relief on their First Amendment Free Exercise claims because the government in each case failed to show that its COVID-19 restrictions were the least restrictive means of stemming the virus' spread.  Despite the above blueprint for raising successful challenges to the allegedly harsher treatment of religious services compared to secular programming at SMT as a violation of the First Amendment Free Exercise Clause, Plaintiffs, who had previously raised such a Free Exercise claim in their original complaint, now choose to pursue their challenge solely on Fourteenth Amendment Equal Protection grounds.  This might be explained by the greater level of deference courts are required to afford prison officials' judgments (*i.e.*, a less exacting "reasonableness" test) than is ordinarily applied to constitutional challenges in free society, as discussed in detail below, *infra* at 32-37.

94, PageID.979 (Defendants arguing that "the temporary closure and/or restrictions placed on group religious services at SMT easily survive Fourteenth Amendment scrutiny, as they are more than suitably tailored to serve a compelling state interest.") (quotations omitted); ECF No. 96, PageID.1008 (Plaintiffs arguing that "Defendants correctly identify that strict scrutiny applies to disparate treatment of fundamental rights – such as religious exercise")). While true that a government action can "be sustained only if it is suitably tailored to serve a compelling state interest" where there is disparate treatment and "classifications [] disadvantage a suspect class, or [] impinge upon the exercise of a fundamental right," *Maye*, 915 F.3d at 1085-86, strict scrutiny is not the appropriate standard for Plaintiffs' particular Equal Protection claim.

First, relevant caselaw indicates that "strict scrutiny has been reserved for laws that discriminat[e] among religions," and not for a "plaintiff's Equal Protection claim [] based on an asserted **suspect class of all religions,** i.e., he is being treated differently than a non-religious prisoner." *Jordan v. Caruso*, No. 06-CV-10979, 2009 WL 2960031 (E.D. Mich. June 11, 2009) (emphasis in original and quotations omitted), *report and recommendation adopted*, 2009 WL 2960030 (E.D. Mich. Sept. 14, 2009); *see also Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 339 (1987) ("[*Larson v. Valente*, 456 U.S. 228 (1982),] indicates that laws discriminating *among* religions are subject to strict scrutiny, ... and that laws 'affording a uniform benefit to all religions' should be analyzed under [*Lemon v. Kurtzman*, 403 U.S. 602 (1971)].") (emphasis in original).  More importantly, where, as here, a plaintiff's Equal Protection claim is based on an asserted "fundamental right to free exercise of religion," the Supreme Court has applied only rational basis scrutiny in its

review of an Equal Protection fundamental right to religious free exercise claim if the same set of facts fail to state a First Amendment Free Exercise claim. *See Locke v. Davey*, 540 U.S. 712, 720 n.3 (2004) ("Davey also argues that the Equal Protection Clause protects against discrimination on the basis of religion. Because we hold [] that the program is not a violation of the Free Exercise Clause, however, we apply rational scrutiny to his equal protection claims."); *Johnson v. Robison*, 415 U.S. 361, 375 n.14 (1974) ("Unquestionably, the free exercise of religion is a fundamental constitutional right. However, since we hold [] that the Act does not violate appellee's right of free exercise of religion, we have no occasion to apply to *the challenged classification* a standard of scrutiny stricter than the traditional rational-basis test.") (emphasis added); *see also St. John's United Church of Christ*, 502 F.3d at 638 ("Where a plaintiff's First Amendment Free Exercise claim has failed, the Supreme Court has applied only rational basis scrutiny in its subsequent review of an equal protection fundamental right to religious free exercise claim based on the same facts.") (citing *Wirzburger v. Galvin*, 412 F.3d 271, 282-83 (1st Cir. 2005)).

It makes little sense to permit Plaintiffs to circumvent this precedent – and application of the more deferential "rational basis" scrutiny – by re-casting (or bringing in the first instance) their Free Exercise challenge to SMT's allegedly harsher treatment of religious services as an Equal Protection violation. Ultimately, the above authorities teach that if the challenged government conduct did not violate Plaintiffs' right of free exercise of religion, the Court should apply rational basis scrutiny when reviewing their Equal Protection claim. This is particularly true here, where Plaintiffs explicitly allege that their Equal Protection claim is premised on the "disparate treatment of fundamental rights –

such as **religious exercise**.”  (ECF No. 96, PageID.1008) (emphasis added).  For the reasons discussed below, the Court finds that the facts alleged in Plaintiffs' complaint fail to sustain a Free Exercise claim, and so their Equal Protection claim is subject to the “rational-basis test.” *Johnson*, 415 U.S. at 375 n.14.

As an initial matter, that the complaint alleges sufficient facts to state a plausible RLUIPA claim does not compel the same conclusion with respect to Plaintiffs' First Amendment claim.  This is because “[c]ourts have recognized that, in the prison context, RLUIPA provides greater protections than the First Amendment.”  *Fox*, 949 F.3d at 277. The Free Exercise Clause of the First Amendment to the United States Constitution provides that “Congress shall make no law . . . prohibiting the free exercise [of religion].” U.S. Const. Amend. I.  *See also Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940) (stating that the First Amendment is applicable to the States through the Fourteenth Amendment).

The Supreme Court has made clear that “convicted persons do not forfeit all constitutional protections by reason of their conviction and confinement in prison,” including those afforded by the First Amendment.  *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (quoting *Bell v. Wolfish*, 441 U.S. 520, 545 (1979)).  That right, however, is subject to the unique challenges of running a penal system.  *Id.*  “Because ‘the problems of prisons in America are complex and intractable,’ and because courts are particularly ‘ill equipped’ to deal with these problems, [courts] generally have deferred to the judgments of prison officials in upholding [prison] regulations against constitutional challenge.” *Shaw v. Murphy*, 532 U.S. 223, 229 (2001) (quoting *Procunier v. Martinez*, 416 U.S. 396, 404-05 (1974); *see also Hayes v. Tennessee*, 424 F. App'x 546, 550 (6th Cir. 2011).  Thus,

with respect to First Amendment claims, a plaintiff inmate bears the "heavy burden" of "overcom[ing] the presumption that the prison officials acted within their broad discretion." *Shaw*, 532 U.S. at 232. Accordingly, "prison regulations alleged to infringe constitutional rights are judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *O'Lone*, 482 U.S. at 349 (citing *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 128 (1977)). Put succinctly, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987).

Under *Turner*, in determining the reasonableness of the regulation at issue, four factors come into play:

> (1) whether there exists a "'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it,"
>
> (2) whether there are "alternative means of exercising the right that remain open to prison inmates,"
>
> (3) the "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," and
>
> (4) the availability of a "ready alternative . . . that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests."[13]

*Turner*, 482 U.S. at 89-91. A "trial court is not required to weigh evenly, or even consider explicitly, each of the four *Turner* factors." *Spies v. Voinovich*, 173 F.3d 398, 403 (6th Cir.

---

[13] The *Turner* Court noted that "[t]his is not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Turner*, 482 U.S. at 90-91.

1999).  Rather, the four factors are "simply 'relevant' to the ultimate inquiry a court must undertake" in "determining whether a prison regulation is 'reasonably related to legitimate penological interests.'"  *Id*. (quoting *Turner*, 482 U.S. at 89).  Moreover, "[w]here a state penal system is involved, federal courts have . . .  additional reason to accord deference to the appropriate prison authorities."  *Turner*, 482 U.S. at 89.

Here, based on the facts as alleged in the complaint, the Court finds that Plaintiffs cannot meet their "heavy burden" to show that the prior temporary ban and/or current restrictions on religious services were not at least reasonably related to a legitimate penological interest.  *Shaw*, 532 U.S. at 232.  The first *Turner* factor, which requires only a "valid, rational connection" between the challenged measure and the state interest, is squarely in Defendants' favor.  As discussed above, *supra* at 19-20, Defendants have articulated a compelling state interest in protecting inmates and staff from the spread of COVID-19 that is advanced by these measures.  *O'Lone*, 482 U.S. at 351 ("it cannot be seriously maintained that 'the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational'") (quoting *Turner*, 482 U.S. at 89-90).  Moreover, the Court "may not second-guess the state's medical and scientific judgments" on how to best prevent another outbreak or repeat infections.  *Bristol Reg'l Women's Ctr., P.C. v. Slatery*, 7 F.4th 478, 483 (6th Cir. 2021) (quotation omitted).  Because the challenged measures address a legitimate health concern of the State's prison, the Court finds this factor to be the single most compelling in its analysis.  *See Turner*, 482 U.S. at 89.

The second factor – whether Plaintiffs have an alternate means of exercising the

right at issue – also favors Defendants.  The U.S. Supreme Court has made clear that the real consideration is not whether there exists a religiously-equivalent substitute for the particular practice in question, but rather whether affected inmates have some other meaningful opportunities to practice their religion.  *See O'Lone*, 482 U.S. at 351-52.  Indeed, the *Turner* Court "examined whether inmates were deprived of 'all means of expression.'"  *Turner*, 482 U.S. at 92.  Here, during the Temporary Closure Period when the Chapel was closed, Plaintiffs do not allege that they were prevented from practicing their religion in other meaningful ways.  Indeed, as evidenced by the Warden's Forum report dated July 30, 2020, stating that "Prisoners are free, of course, to practice their particular faith on an individual basis in their housing units," Plaintiffs do not allege *any* restrictions on those individual housing unit practices.  (ECF No. 92, PageID.935).  Though Plaintiffs may seek to exercise their religions in a more communal manner, the complaint does not allege a deprivation of "all means of expression."  *Turner*, 482 U.S. at 92.  The analysis applies even more squarely to the restrictions imposed during the Current Restrictions Period, where Plaintiffs have been able to participate in group religious services at the Chapel and are allowed meaningful opportunities to practice their religion together, albeit potentially without the use of "least restrictive" measures.  *See O'Lone*, 482 U.S. at 351-52.  Moreover, Director Washington's Office Memorandum dated June 23, 2021, reflects that Plaintiffs are at least allowed "clergy visits" as permitted under prisoner visiting standards, and that the "MDOC shall make video visiting available to [] clergy in

accordance with the video visiting standards." (ECF No. 92, PageID.889).[14]

Overall, and particularly in light of the Court's analysis of the first factor, the Court finds that the complaint does not allege sufficient facts to overcome the presumption that Defendants acted within their broad discretion in their prior temporary ban and current level of restrictions imposed at SMT to stem the spread of COVID-19. Thus, the facts alleged in Plaintiffs' complaint would fail to state a Free Exercise claim.

Consequently, Plaintiffs' Fourteenth Amendment Equal Protection claim is subject to rational basis scrutiny. *Johnson*, 415 U.S. at 375 n.14. ("since we hold [] that the Act does not violate appellee's right of free exercise of religion, we have no occasion to apply to the challenged classification a standard of scrutiny stricter than the traditional rational-basis test."); *see also Turner*, 482 U.S. at 89. Based on the allegations in the complaint, and unlike the RLUIPA claim in which Plaintiffs plausibly alleged that Defendants failed to use the least restrictive means in furthering a compelling government interest of

---

[14] While the Court's discussion of the above two factors are sufficient to find that Plaintiffs' complaint fails to state a Free Exercise claim, *see Spies*, 173 F.3d at 403 ("[a] trial court is not required to weigh evenly, or even consider explicitly, each of the four *Turner* factors"), the third and fourth factors do not favor Plaintiffs, either. As to the third, some of the Plaintiffs in this case have actually filed suit against the MDOC, arguing that MDOC and SMT officials have not done *enough* to protect them from the spread of COVID-19. *See Rouse, et al. v. Washington, et al.*, No. 20-11409 (E.D. Mich. Hon. Mark A. Goldsmith). *See also Wyser-Pratte Mgmt. Co., Inc. v. Telxon Corp.*, 413 F.3d 553, 560 (6th Cir. 2005) (courts may take judicial notice of, among other things, public records on a motion to dismiss without converting it to one for summary judgment.). As to the fourth factor, Defendants point to Chaplain Meyers' declaration attesting to her attempts to strike a "reasonable balance" to allow religious gatherings to resume while minimizing the spread of COVID-19, and while RLUIPA requires Defendants to show that there are no viable, lesser restrictive alternatives, for purposes of a First Amendment claim in the prison context, "prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint," much less that any such alternatives would be possible at *de minimis* cost. *Turner*, 482 U.S. at 90-91.

stemming the spread of COVID-19 at SMT, Plaintiffs fail to show these same restrictions on religious services were not at least rationally related to that interest. *Jordan*, 2009 WL 2960031, at *18; *see also Bristol Reg'l Women's Ctr., P.C.*, 2021 WL 3412741, at *2 ("the government has no obligation to produce evidence supporting the rationality of its actions," and courts must "defer to a state's judgment that there is a problem that merits correction."). Thus, Plaintiffs fail to state a viable Equal Protection claim, and it should be dismissed.[15]

Finally, because Plaintiffs fail to state an Equal Protection Claim, their ELCRA claim should be dismissed, as well. *See supra* at 25 n.9; *Lucas*, 203 F.3d at 972 n.4.

## III.   CONCLUSION

For the reasons set forth above, **IT IS RECOMMENDED** that Defendants' motion to dismiss **(ECF No. 94)** be **GRANTED IN PART AND DENIED IN PART** as follows: the motion should be **GRANTED** as to Plaintiffs' Equal Protection and ELCRA claims against Defendants in their individual capacities for monetary damages, and **DENIED** as to Plaintiffs' RLUIPA claims during the Current Restrictions Period against Defendants Washington, Shaver, Meyers and LaFave in their official capacities for injunctive relief.

Dated: June 13, 2022                           s/David R. Grand
Ann Arbor, Michigan                          DAVID R. GRAND
                                                        United States Magistrate Judge

---

[15] While the above analysis alone is a sufficient basis to dismiss the Equal Protection claim, it is worth noting that Defendants also raise a qualified immunity defense on that claim. Based on all of the above, Plaintiffs fail to show a constitutional violation, much less point to clearly established law indicating that a prison's regulations imposing certain different restrictions on group religious services than other secular programming in response to the COVID-19 pandemic violates the *Equal Protection Clause. See Beaton v. City of Allen Park*, 2015 WL 3604951, at *10 (E.D. Mich. Jun. 8, 2015) (stating that a plaintiff bears the burden to show "a constitutional right was violated and that the right was clearly established at the time of the violation.") (quotations omitted).

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge. A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1). Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.


## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 13, 2022.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager